**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DION RENE DREW**,

        **Petitioner,**

                                        **Civil action no. 3:09cv59**
**vs.**                                    **Criminal action no.  3:05cr70**
                                          **(Judge Bailey)**

**UNITED STATES OF AMERICA,**

        **Respondent.**

## REPORT AND RECOMMENDATION

## I.  Introduction

On September 4, 2009, Petitioner filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set

Aside, or Correct Sentence by a Person in Federal Custody. (Dkt.# 130). On September 8, 2009, the

Government was ordered to respond. (Dkt.# 133).  The Government filed its response on October

8, 2009. (Dkt.# 139)  Petitioner filed his Reply[1] to the Government on November 10, 2009. (Dkt.#

141).

## II.  Facts

### A.  Conviction and Sentence

On March 7, 2006, after a one-day trial, petitioner was convicted of all three counts from a

three-count indictment: Count One, possession with intent to distribute to distribute approximately

3.8 grams or more of cocaine base, also known as "crack," as defined in 21 U.S.C. §§ 812(c),

Schedule II(a)(4), in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(C);  Count Two, possession of

a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1); Count Three, felon

---

[1] Petitioner's reply was titled "Traverse."

in possession of a firearm, in violation of 18 U.S.C. §§ 922(g), 922(g)(1) and 924(a)(2).

On June 26, 2006, petitioner was sentenced to one hundred fifty-one months imprisonment on Count One, with three years supervised release, a fine of $1,100.00, and a special assessment of $300.00; sixty months imprisonment on Count Two to run consecutively to the sentence on Count One; and 120 months imprisonment on Count Three, to run concurrently to the sentence on Count One, with a fine of $1,100.00 and a special assessment of $300.00. (Dkt.# 71).

## B.  Direct Appeal

On June 27, 2006, petitioner filed a Notice of Appeal.  (Dkt.# 73).  On appeal, counsel filed an Anders[2] brief on his behalf, suggesting that the District Court:

1) erred in denying petitioner's motion to dismiss the indictment;

2) erred in denying his motion challenging the validity of the search warrant, and

2) erred in sentencing petitioner.

Petitioner filed a *pro se* supplemental brief, contending that the District Court:

1) erred in determining the drug quantities attributable to him;

2) erred in failing to differentiate between  crack cocaine and cocaine base; and

3) erred in refusing his request for additional *voire dire*.

On November 15, 2007, the judgment of the District Court was affirmed by the Fourth Circuit in an unpublished  *per curiam* opinion. (Dkt.# 92).  Mandate issued on December 7, 2007.

---

[2] Anders v. California, 386 U.S. 738, 744, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967)(holding that court-appointed counsel for an indigent has a duty to support his client's appeal to the best of his ability, and if, after conscientious examination, he/she finds the case to be wholly frivolous, he/she should so advise the court and request permission to withdraw, while submitting a brief referring to anything in the record that might arguably support the appeal.  The indigent client should then be permitted to submit his/her own *pro se* supplemental brief, raising any issues he/she chooses. If the Court, upon its own exam, decides that the case is indeed frivolous, counsel's request to withdraw will be granted and the appeal will be dismissed.  If there are arguable legal points, the indigent will be afforded the assistance of counsel to argue them).

(Dkt.# 93).  Petitioner filed a petition for a writ of *certiorari* with the United States Supreme Court which was denied on October 20, 2008.  (4th Circ. Dkt.# 66) (06-4832).

## C.  **Federal Habeas Corpus**

### **Petitioners' Contentions (Dkt.# 130 and 130-1)**

In his federal habeas petition, the Petitioner raises the following issues, reordered here for clarity:

1) his inherent right to a presumption of innocence was violated when he was forced to selecta jury and proceed to trial while dressed in jail clothing;

2) the Government violated its statutory and Constitutional duty to disclose information that could have affected petitioner's decision whether to plead guilty or proceed to trial;

3) the indictment was constructively amended by evidence adduced at trial suggesting petitioner possessed a firearm during a "crime of violence," instead of that he possessed a firearm during a drug trafficking crime, as the indictment charged;

4) trial counsel was ineffective because he:

> a) failed to deliver on the promise he made in his opening statement that he would present evidence negating the Government's theory of the case;

> b) failed to either stipulate to petitioner's prior drug conviction or to request that the counts petitioner was charged with be severed for trial purposes, because the jury's opinion of petitioner during deliberation on the instant drug charge was tainted by its knowledge of his prior drug conviction, admissible to prove the felon in possession charge;

> c) failed to investigate the background of an informant and request a missing witness instruction when the Government failed to call that witness to testify;

> d) failed to contest the amount of drugs attributable to petitioner;

> e) failed to object to petitioner being tried in jail clothing;

> f) failed to object to statements made by the District Court to the effect that petitioner was guilty before he was even tried; and

> g) did not move to suppress the warrantless search of the vehicle.

5) Appellate counsel was ineffective for:

      a) not raising petitioner's Ground One claim on appeal;

      b) not raising petitioner's Ground Two claim on appeal; and

      c) not raising petitioner' Ground Three claim on appeal.

As relief, petitioner requests that he be granted an evidentiary hearing and any other relief deemed just or proper.

## Government's Response (Dkt.# 139)

1)     At least one of petitioner's arguments has already been raised and decided on direct appeal; nearly all of the others, despite being couched as ineffective assistance of counsel claims, are procedurally defaulted.

2)     Petitioner's arguments are without merit.

3)     Although it is true that petitioner appeared for trial dressed in his jail clothing, the judge directed that he wear a blazer over them throughout the entire proceedings. No one identified petitioner as dressed in jail clothes and the jury did not notice the jail uniform. Furthermore, because petitioner did not object to his appearance in jail clothing, he abandoned the right not to appear so in front of the jury. This claim could have been raised on appeal and is procedurally defaulted.

4)     Petitioner claims that counsel was ineffective for not calling his mother as a witness. However, the Fourth Circuit has recognized that counsel's strategic decision not to call family members is not objectively unreasonable.

5)     Petitioner's claim that counsel was ineffective for not seeking a severance of counts for trial or stipulating to his prior drug conviction fails, as Fed. R. Crim. Pro. 8 permits joinder of separate offenses where they are connected with or constitute part of a common scheme or plan. Further, the Fourth Circuit has found no abuse of discretion in the denial of a motion to sever under Rule 14, where several drug counts and a felon in possession charge, alleged in the same indictment, were tried in the same case. While a defendant may stipulate to a prior conviction, there are valid reasons for not doing so, such as counsel's belief that the Government cannot prove the identity of the defendant to the prior conviction.

6)     Petitioner's claim that counsel was ineffective for failing to investigate the confidential informant or request a missing witness instruction fails. The identity of an informer who is a "mere tipster" need not be disclosed. Furthermore, when an informant is used for the limited purpose in obtaining a search warrant, their identity need not be disclosed.

4

Accordingly, the informant's personal history was immaterial to both the Government's and petitioner's cases; as such, the informant was not a 'missing witness,' and so no such instruction was needed.

7)    Petitioner's claim that the Government failed to provide exculpatory <u>Brady</u>[3] evidence has no merit. The allegedly non-disclosed evidence petitioner attached, claiming he only obtained pursuant to a FOIA request, is a portion of the material that was disclosed to the defense in the Government's March 2, 2006 Jencks[4] and <u>Giglio</u>[5] disclosures. Furthermore, it is not relevant to the search of petitioner's motel room. There was no <u>Brady</u> violation.

8)    Petitioner's claim that the Government constructively amended the indictment fails. Evidence at trial was that at the same time petitioner possessed with the intent to distribute 3.8 grams of cocaine base, he also possessed, in furtherance of his drug dealing, the Lorcin .380 pistol introduced into evidence. Proof at trial showed that the gun was used by petitioner to protect his drug business, not for some unrelated purpose, and the jury was properly instructed as to that.

9)    Counsel was not ineffective for failing to suppress the warrantless search of the vehicle because petitioner identified it as one that he had rented and orally consented to its search, asserting that no evidence of a crime would be found inside. Furthermore, probable cause existed to search the vehicle without a warrant for additional evidence, after the evidence seized pursuant to the search warrant in the motel room revealed some, but not all of the items described by the tipster as being in petitioner's possession. This Fourth Amendment issue was fully available to petitioner on appeal and was not raised, so it is procedurally defaulted.

10)   Petitioner's claim that counsel was ineffective for failing to contest the amount of drugs

---

[3] <u>Brady v. Maryland</u>, 373 U.S. 83; 83 S. Ct. 1194; 10 L. Ed. 2d 215 (1963) (holding that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution).

[4] The Jencks Act, 18 U.S.C. § 3500, provides that after a witness for the government has testified on direct examination in a criminal case, the government must produce any statement of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. 18 U.S.C.S. 3500(b). The Act only applies to an existing prior statement of a government witness concerning matters covered by direct examination. Under the Jencks Act, prosecution witness statements include written statements made by the witness and signed or otherwise adopted or approved by him; stenographic, mechanical, electrical or other recording, or a transcription of it, which is substantially verbatim recital of an oral statement made by the witness to an agent of the Government and recorded contemporaneously with the making of such oral statement; or a statement, however taken or recorded, or a transcription of it in any made by the witness to a grand jury. 18 U.S.C. § 3500(e).

[5] <u>Giglio v. U.S.</u>, 405 U.S. 150, 92 S. Ct. 763; 31 L. Ed. 2d 104 (1972)(holding that the prosecution's failure to inform a jury that a witness had been promised that he would not be prosecuted in exchange for his testimony was a failure to fulfill its duty to present all material evidence to the jury, including material tending to impeach a witness' character or testimony, and constituted a violation of due process, requiring a new trial).

attributable to him was raised on direct appeal and rejected by the Fourth Circuit and cannot now be raised in this collateral attack.

**Petitioner's Reply (Dkt.# 246)**

In his reply, Petitioner reiterates his claims previously made in his § 2255 motion, and attempts to refute the Government's position of procedural default on the same. He points to the <u>Anders</u> brief filed as proof on ineffective assistance of appellate counsel, agreeing with the Government that his many "meritorious issues" could have been raised on appeal, but were not, because of "counsel's failing." He asserts that a fundamental miscarriage of justice will occur unless he is given a decision on the merits of his claims, "without regards to a procedural default." (Dkt.# 141 at 1). He specifically alleges that Ground Four (b)[6] the ineffective assistance of counsel claim was a "dead bang" winner which appellate counsel should have raised as grounds for appeal.

Petitioner cites six instances from the trial record where various witnesses identified him as the person wearing orange prison garb, to refute the Government's contentions that no one identified him as being dressed in prison wear and that the jury did not notice what he was wearing, to reiterate his claim of prejudice from appearing at trial so dressed. He attaches a signed affidavit in which he explains the circumstances regarding why he was dressed for trial in prison garb instead of his own clothing.

Petitioner avers that defense counsel presented "absolutely no evidence and most importantly offered no explanation to the jury why he was unable to deliver on the promises made" in his opening statement. (<u>Id</u>. at 4). He argues that the Government should have obtained an affidavit from trial counsel to explain what strategic reason he might have had for doing so.

Petitioner asserts, for the first time, that the missing witness, one Kathy Watson, "was an informant actively working for the police and had a vested interest and motive to plant drugs in

---

[6] Ground Four (b) is petitioner's claim that counsel was ineffective for not stipulating to his prior drug conviction or seeking to have the counts he was charged with severed for trial purposes.

Petitioner's hotel room [as] is evident by the April 14, 2006 report appearing in the Journal Panhandle." (Id. at 7).[7] He cites this as proof that this same Kathy Watson "proceeded to leave drugs in Petitioner's hotel room and then called her handler and advise [sic] him that Petitioner was in possession of drugs and two guns. As Ms. Mcbride[8] [sic] testified under oath [sic] it was Ms. Watson that left the drugs in the room." (Id. at 8).

Petitioner reiterates his claim that the Government withheld evidence, despite the Government's contention that the documents petitioner claims he received via a FOIA request had already been provided to defense counsel as Jencks material, saying "[a]s the Court is aware Jencks provided [sic] that after a witness testify [sic] then the prosecution must turn over any statements etcetera [sic] to the defense. If as Respondent avers that this information was turned over only after Detective Harris testify [sic] then such admission only buttress [sic] Petitioner's argument that the government knowingly withheld evidence and as such he did not exercise a [sic] intelligent decision to plead not guilty." (Id. at 9).

Petitioner contends that counsel was ineffective for failing to "bring to the Court's attention that Amendment 484 was applicable where as here the laboratory report clearly establish that the cocaine base contained foreign substance that had no effect on the user." (Id. at 10).

Petitioner reiterates his request for an evidentiary hearing, and asks that the Court address the merits of his motion.

### III. Analysis

### A.    Petitioner's Burden of Proof

---

[7] Petitioner copied directly into his reply, a news article about a Kathy Watson facing federal charges for obstructing a police investigation into a murder in Charles Town, WV, for removing evidence from a motel room (also at the Town House Motor Lodge) in which an individual died of a heroin overdose on September 1 [the article does not provide the year the death occurred].

[8] "Ms. McBride" is Kelly McBride, petitioner's girlfriend.

A petitioner collaterally attacking his sentence or conviction bears the burden of proving his sentence or conviction was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack. 28 U.S.C. § 2255. A motion collaterally attacking a petitioner's sentence brought pursuant to § 2255 requires the petitioner to establish his grounds by a preponderance of the evidence." Sutton v. United States of America, 2006 WL 36859 *2 (E.D. Va. Jan. 4, 2006.

**B.**     **Procedurally Barred Claims**

Before evaluating the merits of petitioner's claims, the Court must determine which of petitioner's issues he may bring in his § 2255 motion and which are procedurally barred.

It is well settled that non-constitutional issues that could have been raised on direct appeal but were not may <u>not</u> be raised in a collateral attack such as a § 2255 motion. (emphasis added) Sunal v. Large, 332 U.S. 174, 178-79 (1947). "[A] final judgment commands respect. For this reason, we have long and consistently affirmed that a collateral challenge may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982). Therefore, the failure to raise a claim on direct appeal may result in a procedural default barring collateral review. Bousley v. United States, 523 U.S. 614 (1998).

Constitutional errors that were capable of being raised on direct appeal but were not <u>may</u> be raised in a § 2255 motion so long as the petitioner demonstrates 1) "cause" that excuses his procedural default, and 2) "actual prejudice" resulting from the alleged error. (emphasis added) United States v. Maybeck, 23 F.3d 888, 891 (4th Cir. 1994).

"In order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, the movant must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack." United States v. Mikalajunas, 186 F.3d 490,

492-493 (4th Cir. 1999). "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." Id.

In establishing "prejudice," the petitioner must show the error worked to his "actual and substantial disadvantage," rather than merely created a possibility of prejudice. See Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). In the alternative to establishing "cause" and "prejudice," the petitioner may demonstrate "actual innocence," or that "it is more likely than not, in light of all the evidence, that no reasonable juror would have convicted him." Bousley v. United States, 523 U.S. 614, 621 (1998). "In order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence." Mikalajunas, 186 F.3d at 493. "Typically, to establish actual innocence, a petitioner must demonstrate actual factual innocence of the offense of conviction, i.e., that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent." Id. at 494. The petitioner must show that "it is more likely than not that no reasonable juror would have convicted him." Schlup v. Delo, 513 U.S. 298 (1995). Should a petitioner prove actual innocence, the court should issue a writ of habeas corpus to prevent a "miscarriage of justice," regardless of whether the issue was procedurally defaulted. Hurdle v. United States, 2007 U.S. Dist. LEXIS 37709, at *6-7 (E.D. Va. May 22, 2007) (relying on Schlup v. Delo, 513 U.S. 298 (1995). Finally, issues previously rejected on direct appeal may not be raised in a collateral attack. Boeckenhaupt v. United States, 537 F.2d 1182 (4th Cir. 1976).

Accordingly, the undersigned concludes that petitioner's Ground One,[9] Two[10] and Three[11] claims are all procedurally defaulted, because petitioner could have, but did not raise them on appeal, unless the petitioner can show cause and prejudice for the default. As cause for his failure to do so, petitioner cites ineffective assistance of appellate counsel. Therefore, it is necessary to review these claims to determine whether cause exists for not raising the claims on direct appeal, and if petitioner was prejudiced by appellate counsel's alleged failure to raise them.

**<u>Ground One</u>: Whether Petitioner's Inherent Right to a Presumption of Innocence was Violated when he was Forced to Select a Jury and Proceed to Trial while Dressed in Jail Clothing.**

Petitioner contends that he was forced to proceed to trial while dressed in jail clothing, 'eviscerating his presumption of innocence" in the eyes of the jury. Apparently at trial, petitioner did wear his prison uniform with a blue blazer, provided by the Court, over it, during the entire proceedings. (Dkt.# 139 at 7). Although it is true that in <u>Estelle v. Williams</u>, 425 U.S. 501, 96 S. Ct. 1691; 48 L. Ed. 2d 126 (1976), the U.S. Supreme Court held that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption of innocence so basic to the adversary system, it has also held that

> judgments shall not be reversed for errors or defects which do not affect the substantial rights of the parties . . . there may be some Constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the federal Constitution, be deemed harmless not requiring the automatic reversal of the conviction.

<u>Estelle v. Williams</u>, *supra* at 507.

---

[9] His inherent right to a presumption of innocence was violated when he was forced to select a jury and proceed to trial while dressed in jail clothing.

[10] The Government violated its statutory and Constitutional duty to disclose information that could have affected petitioner's decision whether to plead guilty or proceed to trial.

[11] The indictment was constructively amended by evidence adduced at trial suggesting petitioner possessed a firearm during a "crime of violence," instead of during a drug trafficking crime, as the indictment charged.

Accordingly, "courts have therefore required an accused to object to being tried in the jail garments just as he must invoke or abandon other rights." (Id. at 507 - 08).

At trial, while several witnesses did identify petitioner as wearing orange,[12] most identified him as wearing the blazer or a suit, with an orange shirt underneath. At least one witness said he was "dressed well . . . in a suit." (Dkt.# 83 at 168). Because petitioner did not object to this issue at trial or on direct appeal, this claim is procedurally defaulted unless petitioner can show "cause" for his failure to object and "actual prejudice" resulting from his failure to do so. U.S. v. Frady, *supra.* Petitioner contends that cause exists for his double procedural default because trial counsel was ineffective for not objecting at the time, and appellate counsel was ineffective for not raising the issue on appeal but instead, only filing an Anders brief, stating that there were no meritorious issues. However, petitioner's argument neglects mention of the fact that he also had the opportunity to file his own *pro se* supplemental appellate brief and did, raising three issues in addition to the three suggested by appellate counsel. Therefore, petitioner's argument fails; he was never deprived of the opportunity to have direct review of this claim. As such, petitioner has failed in his burden to offer any real "cause" to excuse his failure to raise this issue on appeal. Given the overwhelming evidence against him at trial, even without his appearing in front of the jury wearing his orange prison uniform with a blue blazer over it, petitioner cannot show any actual prejudice by this issue having not been addressed. Relief should be denied.

**Ground Two: Whether the Government Violated its Statutory and Constitutional Duty to Disclose Information that Could Have Affected Petitioner's Decision Whether to**

---

[12] Darricka Erby, petitioner's prior felony probation officer, identified petitioner as "[t]he one with the orange and blazer on." (Dkt. 83 at 53). Special Agent Richard Dean identified petitioner as the one wearing "[t]he orange and the navy sport coat. (Id. at 70). The witness Lisa Everhart identified petitioner by saying he was the one in "a blue jacket and orange.' (Id. at 155). The witness Maude Johnson testified that petitioner was '[i]n a suit. Dressed well. . . . In a suit. . . . Blue, I think. [with an] orange-ish [shirt]. I don't know." (Id. at 168). The witness Leslie Long testified that petitioner was "dressed in orange." (Id. at 178). When asked how petitioner was dressed at trial, the witness Torray James testified "I guess in a suit." When asked what color petitioner's shirt was, he said "[i]t looks orange to me." (Id. at 182). When petitioner's girlfriend, Kelly McBride testified and was asked to identify petitioner, she said that he was "sitting in the chair to my left," wearing a coat that "looks blue to me" and a shirt that "looks orange to me." (Id. at 197 - 98).

**Plead Guilty or Proceed to Trial.**

Petitioner alleges that he only discovered, via a Freedom of Information Act ("FOIA") request, information that the Government "knowingly, willfully and intentionally withheld" from him that could have affected his decision regarding whether to plead guilty or proceed to trial. As proof thereof, he attaches a portion of the narrative of Detective Harris, the investigating officer in his case, which he contends shows that petitioner made a controlled purchase with a confidential informant, captured on video surveillance and audio recording. He argues that if only defense counsel had been aware of this evidence, he would not have advised petitioner to proceed to trial. The Government's response indicates that this narrative excerpt does not describe a controlled buy from petitioner,[13] but rather, a buy from a different individual, and the subsequent paragraph describing an informant's tip about petitioner's drug activities in room 67 of the Town House Motel is the document's only relevance to petitioner. Further, the Government contends, the document *was* disclosed to defense counsel pre-trial, on March 2, 2006, as part of its Jencks and <u>Giglio</u> disclosures. Because it was not relevant to the search of petitioner's motel room, there was no <u>Brady</u> violation. Despite this elucidation, petitioner's reply continues to allege that the controlled buy described in the excerpt pertained to him; he insists that the Government failed to turn it over to defense counsel "until after Detective Harris testify" [sic] and thus his <u>Brady</u> rights were violated.

This claim has no support in the record. There was no evidence presented at trial about any controlled buy by the informant from petitioner occurring on August 28, 2005. Despite the excerpt's mention of petitioner being at the scene, the portion of it that petitioner objects to describes a buy by a confidential informant from one JoAnn Christian, not from petitioner, and so it had no exculpatory relevance to him. Furthermore, because the material was already provided by the defense as part of its

---

[13] The controlled buy occurred on August 28, 2005. (Dkt.# 139-1 at 4).

March 2, 2006 Jencks and <u>Giglio</u> disclosures, five days before trial, nothing was withheld from petitioner. Petitioner's attempt to excuse his failure to raise this issue on appeal by alleging ineffective assistance of appellate counsel must fail. As with Ground One, petitioner neglects to mention that he could have raised it himself, in his own *pro se* supplemental brief, after appellate counsel filed his <u>Anders</u> brief. Since the issue is completely without merit, petitioner cannot show actual prejudice by not having these issues addressed. Relief should be denied. No evidentiary hearing is required.

**<u>Ground Three</u>: Whether the Indictment was Constructively Amended by Evidence Adduced at Trial Suggesting Petitioner Possessed a Firearm During Robbery, a "Crime of Violence," Instead of During a Drug Trafficking Crime, as the Indictment Charged**.

Petitioner contends that because testimony at trial was that he possessed a firearm during a crime of violence, an "alleged robbery," rather than in furtherance of his drug trafficking, the Indictment was amended, violating his Fifth Amendment rights. He avers that as a remedy therefor, his conviction and sentence must be vacated.

"A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." <u>U.S. v. Floresca</u>, 38 F.3d 706 (4th Cir. 1994), *quoting* <u>Stirone v. U.S.</u>, 361 U.S. 212, 215 - 16, 4 L. Ed. 2d 252, 80 S. Ct. 270 (1960). And although it is true that "constructive amendments of a federal indictment are error *per se,* and under <u>Olano</u>,[14] must be corrected on appeal even when not preserved by objection, <u>Floresca</u> at 714, it is also true that "not all differences between an indictment and the proof offered at trial, rise to the 'fatal' level of a constructive amendment. As long as the proof at trial does not add anything new or constitute a broadening of the charges, then minor discrepancies between the Government's charges and the facts proved at trial generally are permissible." <u>U.S. v. Hinton</u>, 366 Fed.

---

[14] <u>U.S. v. Olano et al.</u>, 507 U.S. 725, 732, 113 S. Ct. 1770, 123 L.Ed. 2d 508 (1993).

Appx 481, 485 (4th Cir. 2010)*(per curiam), quoting* <u>U.S. v. Fletcher</u>, 74 F.3d 49, 53 (4th Cir. 1996). When analyzing a constructive amendment claim, "it is the broadening [of the bases for a defendant's conviction] that is most important - nothing more." <u>Floresca</u>, *supra* at 711. The key inquiry is whether the defendant has been tried on charges other than those made in the indictment. <u>U.S. v. Brice</u>, 369 Fed. Appx.416, 419 (4th Cir. 2010)(per curiam). <u>Olano</u> also held that "Fed. R. Crim. P. 52 provides: (a) Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded. (b) Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." <u>Olano</u>, *infra* at 731. In order to prevail on his constructive amendment claim, petitioner must survive the plain error test set forth in <u>Olano</u>: he must show that there was 1) error; 2) it was plain; 3) it affected his substantial rights; and 4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings (i.e., affected its outcome). <u>Olano</u>, *supra* at 732.

An indictment that is constructively amended at trial violates the Constitution, because the Fifth Amendment requires that a grand jury's indictment guarantee that the allegations in an indictment and the proof presented at trial match, to ensure that the defendant is not later exposed to a second prosecution, and to give the reasonable notice of the charges, so that he can prepare his defense. <u>U.S. v. Murphy</u>, 406 F.3d 857, 861 (7th Cir. 2005).

Here, there was no error and no constructive amendment of the indictment. The testimony at trial was consistent with the charges that, at the same time petitioner possessed, with the intent to distribute, 3.8 grams of cocaine base, seized from his motel room, he also possessed, in furtherance of his drug trafficking activity, the .380 Lorcin pistol that was introduced into evidence. Proof at trial showed that petitioner used the pistol to protect his drug business: he brandished the pistol, pistol-whipped and beat one Torray James, a witness for the Government, because he believed James had robbed Lisa Everhart, petitioner's drug-dealing partner, of drugs and money.

(Dkt.# 83 at 181 - 193).

Petitioner was not charged with, nor was he convicted of armed robbery. The jury was properly instructed that

> [w]hoever, during and in relation to any drug trafficking crime for which he may be prosecuted in a court of the United States, knowingly possesses a firearm in furtherance of such crime shall be guilty of a federal offense.

> Two essential elements are required to be proved in order to establish the offense charged in count 2. First, that the defendant committed the crime charged in count 1; second, that the defendant possessed a firearm in furtherance of the crime charged in count 1.

> The term 'drug trafficking crime' means an offense that is a felony and involves the distribution, manufacture, or importation of any controlled substances. The offense alleged in count 1 of the indictment, possession with intent to distribute 3.8 grams of cocaine base, also known as "crack," is a drug trafficking crime.

> The term 'firearm' means any weapon which is designed to, or may readily be converted to expel a projectile by the action of an explosive. 'Furtherance' should be given its plain meaning of furthering, advancing or helping forward. In making this determination you are free to consider the numerous ways in which a firearm might further or advance drug trafficking.

(Dkt.# 65 at 17 - 21).

The jury was free to consider that the pistol-whipping and robbery of the witness James was one of the "numerous ways in which a firearm might further or advance drug trafficking," and their verdict reflects that they correctly did that. There was no unconstitutional constructive amendment. The overwhelming evidence presented at trial by numerous witnesses who put the gun in petitioner's hand, along with testimony by the same witnesses of petitioner's drug activity, was sufficient for the jury to reach the conclusion that it did.

Petitioner's attempt to excuse his failure to raise this issue on appeal by alleging ineffective assistance of appellate counsel must fail. As with Grounds One and Two, petitioner neglects to mention that he could have raised it himself, in his own *pro se* supplemental brief, after appellate counsel filed

15

his <u>Anders</u> brief.  Since the issue is completely without merit and lacks support in fact and law, petitioner cannot show actual prejudice by not having it addressed.  Relief should be denied.

**<u>Ground Four (a)</u>: Whether Trial Counsel was Ineffective For Failing to Deliver on the Promise he Made in his Opening Statement that he Would Present Evidence Negating the Government's Theory of the Case**.

Petitioner alleges that counsel's opening statement promised to present evidence negating the Government's theory of the case regarding the underlying reason that petitioner was in the hotel room with two women, but failed to do so.  Petitioner contends that counsel failed to put the Government's case to the "severe adversarial testing demanded by the Constitution and casting Petitioner as a bad person."  (Dkt.# 130-1 at 6).  Petitioner argues that counsel promised that petitioner's mother would testify on his behalf, and when she did not appear, the jury was left with the impression that petitioner's "own mother would not come to his defense." (<u>Id</u>.).  Petitioner attaches a sworn, notarized affidavit from his mother, in support of this claim.

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance.  The first prong of the test requires that the petitioner demonstrate that counsel's performance was deficient and "fell below an objective standard of reasonableness." <u>Strickland</u> at 688.  The second prong requires the petitioner to show that the deficient performance prejudiced the defense.  <u>Id.</u> at 687.  In order to satisfy the prejudice requirement of the two-prong test set forth in <u>Strickland</u>, defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Lockhartv. Fretwell</u>, 506 U.S. 364 (1993).

A Court must indulge a strong  presumption that counsel's conduct falls within the wide range of reasonably professional assistance.  <u>Strickland</u> 466 U.S. at 689-90.  Moreover, there are no absolute rules in determining what is reasonable performance.  <u>See</u> <u>Hunt v. Nuth</u>, 57 F.3d 1327, 1332 (4th Cir.

1995) (counsel's representation is viewed on the facts of a particular case and at the time of counsel's conduct).

The affidavit from petitioner's mother reads, in pertinent part:

> . . . I am the mother of Dion Rene Drew . . .
> . . . I personally retained Sherman L. Lambert, Snr. [sic] to represent Dion Rene Drew in the above entitled criminal matter.
> . . . on more than one occasion I discuss [sic] with counsel my willingness to testify on behalf of Dion Rene Drew as to the underlying reasons he was in a hotel room with two women.
> . . . That counsel advise Affiant [sic] that he would make known the date certain when trial was set to commence.
> . . . That counsel never called Affiant [sic] home or left a message on the answering machine as to the date of the trial of Dion Rene Drew.
> . . . That as a direct and proximate cause of counsel's failure to advise Affiant as to the date of the trial Affiant was unable to appear in Court to testify on Dion Rene Drew [sic] behalf.
> . . . That as a direct and proximate cause of counsel's failure to advise Affiant as to the date of the trial Affiant was unable to provide Dion Rene Drew with suitable clothing to proceed to trial before a jury instead of jail clothing . . .

(Dkt.# 130-1 at 7 - 8).

It is clear from the record, that defense counsel expected petitioner's mother to appear and to testify. He listed her as a character witness on the witness listed he filed on March 2, 2006. (Dkt.# 45).

Counsel's opening statement included this comment about petitioner's mother's anticipated testimony:

> You will also hear testimony from his mother, Ms. Davis. She will come. And she will tell you about her son, things that only a mother can talk about. Being in a hotel room with two women. He was there for, I call it romance. There is no evidence whatsoever that's been presented or will be presented today that ties Mr. Drew to the actual drugs, to the gun, to the magazine. That's what I want you to look at.

(Dkt.# 83 at 51).

However, when the Government had finished its case in chief, during a Rule 29 motion period after the jury panel had exited the courtroom, and after defense counsel made his motion for acquittal, this exchange was had with the Court:

THE COURT: So it is a Rule 29 motion for judgment of acquittal. Are there any other points that I have not - - ?

MR. LAMBERT: No other points, judge. And my witness - -

THE COURT: I think you're going to the weight of the evidence - - .

MR. LAMBERT: Yeah. Yeah. My witness is not here, judge. So, we don't have anyone.

*. . . [AUSA rebuts defense counsel's argument for a judgement of acquittal]*

THE COURT: That's, at least in this point in time, how I see it. So, we do have your witness available Mr. Lambert?

MR. LAMBERT: No, Judge, we don't. We don't have a witness available. She is not here and I'm not going to hold the Court up any further.

THE COURT: That's okay. But it wasn't drop service, was it?

MR. LAMBERT: No, Judge, this is his mom.

THE COURT: His mother?

MR. LAMBERT: Ms. Davis. Janice Davis is his mother. There's some problems there, Judge, which I won't go into. But - - so we have no - - we have no witnesses to call on behalf of the defense.

(Id. at 228 - 29).

Petitioner's attempt to argue that it was counsel's fault his mother did not appear to testify on his behalf lacks merit. Clearly there were issues between petitioner and his mother, alluded to by counsel to the Court, that counsel was circumspect enough in his ethical duty to his client not to disclose. It is incredulous to assume that petitioner would not have notified his own mother of the date of his trial, or that she could have been unaware of the date. Whatever the reason that petitioner's mother did not appear, it is apparent from the record that counsel expected that she would, and was surprised when she did not. Logically, counsel would not have listed her as a character witness and mentioned her in his opening statement, if he did not anticipate she would appear. Even assuming, *arguendo,* that counsel was ineffective in not "notifying" petitioner's mother of the trial date, petitioner cannot prove prejudice,

because the obviously biased testimony his mother now claims, almost three and a half years after the fact,[15] that she purportedly intended to give (that petitioner was in the room with two women for - - as counsel put it in his opening statement: "romance") was so at odds with the credible, consistent[16] and uncontroverted testimony of the two women themselves,[17] and that of the boyfriend of one of them,[18] who did appear and testify, it is implausible that the jury would have believed it.

The trial record reveals that the two women petitioner was in the hotel room with when the search warrant was executed both testified at trial that they were in that room to purchase drugs from petitioner.  Stephanie Spencer testified thus:

Q.  And do you know Dion Drew?

A.  I do.

Q.  How do you know Dion Drew?

A.  Through my girlfriend, Kelly McBride.

Q.  And can you recall for us when you met him?

A.  Not the exact date.

Q.  Tell us the circumstances.

A.  Well, I met him with Kelly, and we were there to get drugs, basically.

Q.  Who were you there with?

---

[15] The affidavit was dated August 5, 2009, three years and five months after the date of petitioner's trial.

[16] Trial testimony from eight different non-law enforcement witnesses who either purchased drug from petitioner or were present when petitioner sold them corroborated the information provided by the confidential informant.

[17]  Stephanie Spencer and Hannah Slater were the two women present in the Towne House Motel room with Petitioner when the warrant was executed.

[18] Christopher Lancaster testified that: he was Stephanie Spencer's boyfriend; he had met petitioner at the Town House Motel when he went there with Stephanie; petitioner was 'seeing one of my girlfriend's friends [Kelly McBride]; petitioner was present in the room when they all smoked crack together; he saw petitioner with drugs in a black bag; he saw petitioner with the .380 pistol, and saw  petitioner put the pistol away in the white waist band; all testimony consistent with information provided by the confidential informant.  (Id. at 203 - 06).

A.  My boyfriend and another girlfriend.

Q.  Hannah Slater.

A. Where are we talking about?

A.  At the Town House Motel.

Q.  How long or pardon me, how often did you visit the Towne House Motel?

A.  I had only been there one night.

Q.  And how many times that night did you go there?

A.  A few. I couldn't be exactly sure how many.

Q.  Who did you go there with?

A.  My girlfriend Hannah.

Q.  And what was the purpose of you and Hannah going there?

A.  To get crack.

Q.  And who did you get it from?

A.  Well, Kelly or Dion.
. . .
Q.  And tell us about the last time you visited the room [that day].

A.  The last time we visited the room, me and my girlfriend went in and Kelly wasn't
there. Kelly was already at work.  And when we went in, we were there for less than a
minute and the police busted in.

Q.  Who was there when you were there?

A.  Me, my girlfriend, Hannah, and Dion.

Q.  What was your purpose on [sic] being there before the police came?

A.  To buy crack.

(Dkt.# 83 at 210 - 13).

Hannah Slater's direct and cross exam testimony on the subject was consistent with Stephanie

Spencer's:

A. It is a check.

Q. And who wrote the check?

A. I did.

Q. What did you write it for?

A. For drugs for my friend Stephanie and I [sic] were getting drugs, and I just paid her for my part of it.

Q. Who were you getting the drugs from?

A. From Dion.

. . . [cross examination]:

Q. . . . You indicated that you wrote a check and it was for drugs?

A. Yeah, I just - - I didn't have any money, so I gave Stephanie a check.

. . .

Q. And who was the check made out to?

A. To Stephanie.

Q. Stephanie. Were you at the hotel - - I'm sorry. Were you at the hotel during the time that the search warrant was executed? Meaning, that the police officers came into the room?

A. Yes, sir.

. . .

Q. Tell the ladies and gentlemen of the jury who was in the room before - - just before the police officers executed the search warrant?

A. Stephanie, myself, and Dion.

Q. Was anyone else there?

A. No.

(Id. at 218- 20).

Neither woman testified that they were there for "romance" with petitioner. Of note, defense counsel did not ask either of them if they were. The fact that they testified that they were friends with Kelly McBride, who *was* petitioner's girlfriend, and that they were only there to obtain drugs from petitioner` is illuminating. Had there been any real suggestion of 'romance' between the women and petitioner, both the AUSA and defense counsel would certainly have brought that out, as they did with other female witnesses[19] who testified that they had had sexual relationships with petitioner, in addition to obtaining drugs from him.

As for petitioner's claim that counsel failed to put the Government's case to "severe adversarial testing demanded by the Constitution and casting Petitioner as a bad person," counsel did vigorously cross-examine each of the Government's witnesses, attempting to create 'reasonable doubt" by eliciting admissions that: petitioner's fingerprints were not found on any of the evidence (Id. at 83-85, 87-88); no handwriting analysis was performed, confirming that petitioner was the one who made the notations in the notebook recording drug sales, signed to rent the room or the car (Id. at 119); the mirror with striations from drug-cutting on its surface and apparent cocaine residue was not tested to prove that it was crack cocaine residue (Id. at 127 - 28 and 146 - 47); the gunshot residue testing on petitioner's hands came back negative (Id. at 142 - 43); and no fiber analysis, hair or skin follicular testing was ever performed on the black ski mask[20] found in the black duffel bag with petitioner's identification. (Id. at 118). It is apparent from the record that counsel did what he could with the facts, but, as the detective in charge of the case testified, there was "an overwhelming amount of evidence . . . [and] we had caught him red-handed." (Id. at 147). Counsel is not required to be a magician; he cannot make a silk purse

---

[19] Kelly McBride testified that she met petitioner in September or October of 2005 "and I was having sex with him." (Id. at 193). Leslie Long testified that the second time she met petitioner, she spent the night in a Knight's Inn in Charles Town with him. (Id. at 178).

[20] Testimony by one witness revealed that petitioner had pistol-whipped and robbed him, in revenge for a suspected drug transaction theft, while wearing an identical black ski mask. (Id. at 181 - 92).

out of a sow's ear of a case, where the facts are overwhelmingly against his client.

Here, evidence and testimony at trial overwhelmingly proved that petitioner possessed the gun in furtherance of his drug trafficking activity, and petitioner's mother's obviously biased testimony, even had it been given, would not have changed the outcome.

This claim lacks merit. Petitioner has neither proved ineffectiveness nor prejudice, and has failed to sustain his burden under <u>Strickland</u>. Relief should be denied.

**<u>Ground Four (b)</u>: Whether Trial Counsel was Ineffective For Failing to Either Stipulate to Petitioner's Prior Felony Drug Conviction or to Request that the Counts Petitioner was Charged with be Severed for Trial Purposes, Because the Jury's Opinion of him During Deliberation on the Instant Drug Charge was Tainted by Knowing of his Prior Conviction, Admissible to Prove the Felon in Possession Charge**.

Petitioner contends that because the jury's opinion of him during deliberation on the instant drug charge was tainted by its knowledge of his prior conviction, admissible to prove the felon in possession charge, his counts should have either been severed for trial purposes, or counsel should have stipulated to the prior conviction. He alleges that trial counsel was ineffective for failing to request severance or offer to stipulate to it." (Dkt.# 141 at 7). In his § 2255 motion, petitioner does not argue that it was the introduction of the nature of his prior felony drug conviction were prejudicial; he argues that any mention of prior crimes should have been avoided altogether to avoid tainting the jury's opinion of him as one with a propensity toward crime, citing several cases from other jurisdictions, as well as <u>Michelson v. United States</u>, 335 U.S. 469, 475-476, 93 L. Ed. 168, 69 S. Ct. 213 (1948), in purported support of his argument that he was unfairly prejudiced thereby. In his reply, he expands his argument to claim that introduction of the nature of his prior conviction (for distribution of cocaine) "inflam[ed] the jury [to believe] that Petitioner had the propensity to commit drug crimes." (Dkt.# 141 at 6). He also argues for the first time that no curative instruction was given to the jury regarding the prejudicial effect of the mention of his prior felony drug conviction.

Rule 8 of the Fed. Rules of Criminal Procedure permits joinder of separate offenses when they

are connected with or constitute parts of a common scheme or plan. Rule 14 of the Federal Rules of Criminal Procedures specifies in pertinent part:

> (a) Relief. If the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials, or provide any other relief that justice requires.

Fed. R. Crim. Pro. 14(a).

The Fourth Circuit Court of Appeals has found no abuse of discretion in the denial of a motion to sever under Fed. R. Crim. Pro. 14 where, as here, several drug counts and a felon in possession count were charged in the same indictment and tried together in the same trial. U.S. v. Rhodes, 32 F.3d 867, 871 - 72 (4th Cir. 1994). In Rhodes, because the defendant had made no objection at trial,[21] the Fourth Circuit reviewed for plain error. Before beginning its analysis, the Rhodes court noted that when a defendant offers to stipulate the fact of his prior felony conviction, evidence of the nature of that conviction is irrelevant and should be stricken, because the specific nature of a prior conviction is not an element of 18 U.S.C. § 922(g)(1). U.S. v. Rhodes, 32 F.3d 867, 871 - 72 (4th Cir. 1994). However, if a defendant does not so stipulate, the Government must then prove it, because it is an element of the offense. The Rhodes court used the exegesis of the Fed. R. Crim. Pro. 52 plain error rule set forth in U.S. v. Olano, supra, stating that an appellate court's authority is limited, for the purpose of Rule 52(b), to correcting errors which meet four requirements: (1) there must be an error - - that is a "deviation from a legal rule;" (2) the error must be plain - - that is, clear or obvious; and (3) the error must affect substantial rights. Further, the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. Olano, supra at 733 - 35. The Rhodes court then held, that even assuming arguendo, that the admission of evidence was error that was plain, Rhodes still could not meet the third requirement, that the error had affected his substantial rights, because the evidence against him was so

---

[21] The motion to sever, filed within a week after a superseding indictment was filed, was denied on the morning of the first day of trial.

overwhelming, he could show no prejudice. Thus any error, assuming it occurred, did not affect the outcome of the proceedings.

Here, each of the three counts that petitioner was charged with and convicted of arose on the same occasion, incident to the search of his motel room and vehicle, so they were appropriately joined under Fed. R. Crim. Pro. 9. The record reveals that defense counsel did not object to the joinder of the charged offenses for trial. He did not make a pre-trial offer to stipulate to petitioner's prior felony drug conviction. Nor was there a request made for a curative instruction to the jury regarding the possibility of prejudicial inference regarding the propensity of petitioner to commit drug crimes. However, like Rhodes, even assuming, *arguendo,* that counsel erred by not stipulating to petitioner's prior drug conviction, or moving for severance of the counts and, as instead, petitioner's reply suggests, tried the felon in possession charge separately in a bench trial, petitioner cannot make a showing that the error, if any, affected his substantial rights. The record reveals that the testimony and evidence introduced through eight different witnesses who interacted with petitioner incident his drug trafficking, as well as that of four law enforcement officers involved in the investigation was so overwhelming, that the outcome would have been the same anyway. Proof of petitioner's drug trafficking and his possession of the gun in furtherance of it was so conclusive, any possibility of prejudice was negated. Petitioner presented not one witness in his defense. Even Kelly McBride, his own girlfriend (whose loyal but obviously biased and patently incredible testimony at first denied any knowledge of petitioner's drug trafficking),[22] freely testified as to petitioner's possession of the gun. (Dkt.# 83 at 195 - 201). Petitioner

---

[22] Even though McBride's girlfriends, Hanna Slater and Stephanie Spencer, who were both in the room with petitioner when the search warrant was executed, both testified that they went there to get drugs from petitioner or Kelly on repeated occasions, Ms. McBride herself, although she identified the two as her "best friends" and admitted they visited her frequently in petitioner's presence, rather incredibly claimed to be unaware of their regular drug trafficking with petitioner in her presence. (Dkt.# 83 at 194 - 95, ). Upon further questioning, at one point, she grudgingly admitted that she "assumed" but did not know that her girlfriends were getting drugs from petitioner (Id. at 199), but then again recanted, denying that she had ever seen "anyone buy or sell drugs." (Id. at 201), and suggesting that since drugs were found in the room, that the confidential informant, Kathy Watson, had planted them there. Her testimony was not credible and the jury's verdict reflected that.

has neither proved ineffective performance and certainly cannot prove prejudice. Relief should be denied.

**Ground Four (c): Whether Trial Counsel was Ineffective for Failing to Investigate the Background of an Informant and Request a Missing Witness Instruction when the Government Failed to Call that Witness to Testify**.

Petitioner contends that trial counsel's failure to investigate the background of the confidential informant in his case, and his failure to request a missing witness instruction when the Government did not call the informant to testify is evidence of ineffectiveness. He argues that "any competent attorney would have sought to interview the CI . . . [because] the information that was used to obtain the warrant proved to be unreliable as no guns were found in the motel room nor the cache of drugs alluded to. Moreover, when viewed from the context that . . . Ms. McBride . . . testified that the CI was probably the one who left the drugs in Petitioner's motel room . . . it was . . . incumbent upon counsel to have interviewed the CI the only person with relevant knowledge of underlying facts." (Dkt.# 130-1 at 13). Attached to his reply is a copy of an undated newspaper article mentioning charges pending against the CI. He alleges that it proves that the CI had "a vested interest and motive" to plant the drugs. He alleges that the search of his motel room only revealed "a minute user quantity of 3.8 grams" of crack cocaine, a magazine clip for a gun and no guns at all.

Here, the evidence is that on September 26, 2005, the confidential informant, who had provided reliable information to the police in the past, advised that a black male known as "D" was presently occupying Room 67 at the Towne House Motel in Charles Town, WV. The informant reported that he/she had witnessed "D" with 2 black colored handguns, believed to be a 9mm and a .380, once of which "D" was carrying in a Velcro belly band holster. The informant also advised that "D" had clips and ammunition for the weapons (Dkt.# 1 at 2) and that he was selling crack cocaine out of the room.

(Dkt.# 83 at 69).[23] Surveillance was set up, and a warrant was obtained. Upon its execution, petitioner, aka "D" was found, along with two women, in the room, along with two plastic bags of 6 individually packaged pieces of crack cocaine in a black duffel bag also containing petitioner's identification. In the same duffel bag, the magazine for a handgun with 7 rounds of .380 ammunition and a white velcro belly band was found, along with $1,101.00 of U.S. currency, plastic baggies, a digital scale, razor blade and a mirror with striations cut into its surface, and white residue on it. (Dkt.#1 at 2). Also seized was a notebook containing calculations of drug sales and profits. Dkt.# 83 at 134. When advised that the room was being searched and car keys were found, petitioner consented to the search of the vehicle, denying that anything illegal would be found. (Id. at 138 - 139). A search of the car revealed the .380 handgun under the back seat on the driver's side. (Id. at 76).

Despite petitioner's characterizing of the C.I.'s information as "unreliable," the C.I.'s information was extremely accurate. Although the second gun, if it existed at all, was not located, the black .380 handgun, its ammunition, the white Velcro belly band holster were all located. Further, despite petitioner's contention that all that was found in the room was a "minute user quantity of crack," testimony by Detective Steve Harris at trial was that the 3.8 grams found in petitioner's duffel bag was slightly more than an "eight ball" which, broken down into individual "bindles" for resale, would sell for approximately $380 on the street, far more than what a typical user would buy.[24] (Dkt.# 83 at 131 - 33). Upon investigation, the officers were able to locate Torray James, the man robbed and pistol-

---

[23] The Charles Town Police Department Criminal Investigations Division narrative supplement of Detective Lieutenant S.P. Harris, attached to the Government's response, describing the information supplied by the CI on September 26, 2005, omits mention of the second (9mm handgun), but advises that "'Dee' was dangerous and had robbed and pistol-whipped a male known as "Ray" of $500 the previous night, in retribution for a robbery of Lisa Everhart, "Dee's" drug partner, at the Wendy Crites trailer in Ranson, WV, the previous night, while Everhart was selling crack there on his behalf. The CI advised that he/she had been in room 67 at the Towne House motel with Chris Lancaster and Stephanie Spencer to buy crack cocaine, had personally seen petitioner possessing several ounces of crack cocaine while carrying a black handgun in a white Velcro belly band. (Dkt.# 139-1 at 4).

[24] Harris testified that the amount a user would buy would be anywhere from $10 - $100 worth, but typically anywhere between $20 - $50.

whipped by petitioner, and he testified at trial about the incident. Lancaster and Spencer also gave testimony at trial, consistent with information provided by the CI.

The U.S. Supreme Court has long recognized an "informer's privilege," which is actually a Governmental privilege to withhold from disclosure informants' identities, for the purpose of promoting and protecting "the public interest in effective law enforcement [which] . . . recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation. <u>Roviaro v. U.S.</u>, 353 U.S. 53, 60, 1 L. Ed. 2d 639, 77 S. Ct. 623 (1957). Ordinarily, knowledge of a tipster's identity would not be essential in the preparation of an accused's defense, and the public interest in protecting such informants, because their important role in preventing, protecting and prosecuting criminal acts, should weigh heavily in favor of nondisclosure. However, where the informant is an actual participant, and thus a witness to material and relevant events, fundamental fairness dictates that the accused have access to him as a potential witness. In such instances disclosure of identity should be required. <u>McLawhorn v. North Carolina</u>, 484 F.2d 1, 11 - 12 (4th Cir. 1973). Only when an informant's identity is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause," will it be disclosed. <u>Roviaro</u>, *supra* at 60 - 61. Where an informant is a "mere tipster," who is neither a participant in the offense, nor helps set up its commission, but only supplies a lead to law investigating and enforcement officers, that person's identify need not be disclosed. <u>McLawhorn v. North Carolina</u>, 484 F.2d 1, 11 (4th Cir. 1973). Likewise, when an informant is used to proved information for the limited purpose of obtaining a search warrant, that person's identify need not be disclosed. <u>U.S. v. Fisher</u>, 440 F.2d 674, 656 (4th Cir. 1971).

Here, the confidential informant was merely a tipster who provided the information necessary for the limited purpose of obtaining probable cause for a search warrant. The informant was not a participant in the crime, did not help set it up, and only supplied the lead to investigators. As such, there

was no need for the disclosure of the CI's identity, and any investigation into the CI's background was immaterial, as the CI was not going to be a witness at trial.

As for petitioner's allegation that the CI had a motive to plant the drugs in his motel room, to somehow mitigate the consequences of charges pending against him/her, this allegation is unsupported. Habeas petitions must meet heightened pleading requirements. McFarland v. Scott, 512 U.S. 849, 856 (1994). "In order to obtain an evidentiary hearing on an ineffective assistance claim -- or, for that matter, on any claim -- a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing." Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992), *cert. denied,* 507 U.S. 923 (1993), *abrogation on other grounds recognized,* Yeatts v. Angelone, 166 F.2d 255 (4th Cir. 1999). The undated news article petitioner provides does not prove that charges were pending against the CI at the time the information about petitioner's drug activities was provided to law enforcement.

Petitioner's contention that counsel was ineffective for failing to request a 'missing witness" instruction when the Government did not call the CI as a witness also fails. Because the CI was a "mere tipster," there was no "missing witness," and so no missing witness instruction was needed. The CI's absence at trial does not necessarily support petitioner's conclusion that the CI's testimony would have been favorable to him, or that the CI could have been impeached at trial. To the contrary, "[i]t is well settled that the rule regarding missing witness instructions is that if a party has it peculiarly within his [or her] power to produce witnesses whose testimony would elucidate the transaction, the fact that he [or she] does not do it creates the presumption that the testimony, if produced, would be unfavorable." U.S. v. Brooks, 928 F.2d 1403, 1412 (4th Cir. 1991) (internal quotation marks omitted). Given the substance of the information provided by the CI, amply and accurately corroborated by the testimony of the eight non-law enforcement officers who did testify, it is difficult to imagine what benefit

there would have been to petitioner if the CI had been called as a witness. Forgoing choosing such a line of attack that would not help petitioner's case, and would likely only produce more evidence implicating him, was undoubtedly a strategic decision which was not unreasonable under the circumstances. A strategic decision generally will not be second-guessed. Wiggins v. Corcoran, 288 F.2d 629, 640 (4th Circ. 2002).

These claims have no merit, nor any support in fact or law. Petitioner has failed to demonstrate that counsel was ineffective for failing to investigate the CI's background or request a missing witness instruction at trial, let alone that he was prejudiced by anything counsel did or failed to do. Relief should be denied.

**Ground Four (d): Whether Trial Counsel was Ineffective for Failing to Contest the Amount of Drugs Attributable to Petitioner**.

Here, petitioner contends that the "very laboratory report [of the drug analysis in his case] provided by the government conclusively shows that the product allegedly recovered from Petitioner also contained Hydroxine. For sentencing purposes the "hydroxine" should have been subtracted from the total weight of the material . . . A review of . . . the record includes no expert testimony that a mixture of cocaine base and "hydroxine" could be smoked" and therefore, the "government failed to sustain their burden of proof that a mixture of cocaine base and hydroxine could be smoked." (Dkt.# 130-1 at 21). He argues that counsel was ineffective for failing to challenge this.

As the Government correctly noted, petitioner's claim that the Government erred in determining the drug quantities attributable to him has already been raised on appeal in petitioner's *pro se* supplemental brief, and thus it is procedurally barred. The Fourth Circuit Court of Appeals specifically found that there was no error in determining attributable drug quantities. Petitioner's claim that counsel was ineffective for failing to contest this alleged "error" in determining drug quantities fails. There was no error. Therefore, trial counsel's performance can not be found

deficient for failing to object when there was no basis to do so and where objection would be futile. Since petitioner can prove neither deficient performance or prejudice in this regard, he has failed in his burden under Strickland and this claim should be denied.

**Ground Four (e):** **Whether Trial Counsel was Ineffective for Failing to Object to Petitioner's Being Tried in Jail Clothing**.

Petitioner contends that counsel was ineffective for failing to object to his appearing at trial dressed in orange jail clothing. Within the sworn affidavit from petitioner's mother, attached in support of petitioner's Ground Four (a) claim[25] is a assertion that "as a direct and proximate cause of counsel's failure to advise Affiant as to the date of the trial Affiant [sic] was unable to provide Dion Rene Drew with suitable clothing to proceed to trial before a jury instead of jail clothing." (Dkt.# 130-1 at 8).

Petitioner's claim that counsel was ineffective for failing to advise his mother when the trial was going to be so that she could provide street clothing for him to wear, and counsel's failure to object to his appearing at trial wearing an orange jail uniform is a re-hash of Grounds One,[26] the underlying claim of which has already been addressed *supra*, and Ground Four (a), also already addressed *supra*. Both claims were found to lack merit.

As stated previously, courts "require an accused to object to being tried in the jail garments just as he must invoke or abandon other rights." Estelle v. Williams, supra at 507 - 08.

The record reveals that petitioner made no objection to appearing in front of the jury wearing jail 'orange,' and that the Court did provide him with a blue blazer to wear over it. The record also reveals that counsel expected petitioner's mother would appear, listed her as a witness, mentioned her anticipated testimony in his opening statement, and appeared taken by surprise when she did not appear. He advised

---

[25] Petitioner's Ground Four (a) claim is that counsel was ineffective for failing to deliver on the promise he made in his opening argument that petitioner's mother would testify, "negating the government's theory of the case."

[26] Petitioner's Ground One claim is that his inherent right to a presumption of innocence was violated when he was forced to select a jury and proceed to trial while wearing jail clothing.

the Court, when it inquired about her appearance that "[t]here's some problems there, Judge, which I won't go into. But - - so we have no - - we have no witnesses to call on behalf of the offense." (Dkt.# 83 at 229). For whatever reason, petitioner's mother did not come to his trial and bring him other clothing to wear. Petitioner did not object at the time, nor did he raise the underlying claim of prejudice by having to so appear on appeal, in his *pro se* supplemental brief and it is procedurally defaulted. Counsel cannot be found ineffective for failing to object to the jail clothing when petitioner himself did not, and he certainly cannot be found ineffective for petitioner's mother choosing not to attend her own son's trial. Petitioner has failed in his burden under <u>Strickland</u> and this claim, too, should be denied.

**<u>Ground Four (f)</u>: Whether Trial Counsel was Ineffective for Failing to Object to Statements Made by the District Court to the Effect that Petitioner was Guilty Before he was Even Tried**.

Here, petitioner contends that, before jury selection, when the Court was choosing his jury and another for a civil matter, the Court made a statement that rendered his entire proceeding unfair, and counsel failed to object. The statement that petitioner alleges that the Court made to the prospective jurors was

> . . . it is West Virginia. We're not going to mess around. This isn't going to be six month jury selection and a year long trial. We're going to try to get the criminal case selected in about an hour, take a break for those 12 [jurors], continue with the jury selection in the other case, and probably have the criminal case concluded and to you by late afternoon. We're going to try to be very efficient with that. We're going to decide guilt beyond a reasonable doubt of the criminal charges against this individual.

Dkt.# 130-1 at 5.

A review of the trial transcript reveals that petitioner has misstated and taken out of context what the Court said. The statement the Court *actually made* was

> I'm here in this courtroom temporarily. You, the citizens, own it. And the Government is asking you to come out here today, first in the criminal case, to decide whether or not the individual placed upon trial before you should have his liberty or property taken from him. That's the case in a nutshell. We're going to decide guilt beyond a reasonable doubt of the criminal charges against this individual.
>
> As we conclude with the criminal case, we will then be selecting a civil case. This is a

little bit different. The individuals in that particular instance have a dispute over who caused damages. They aren't resulting to fist to cuffs [sic] or shooting at one another or using truck bombs to settle old scores. They are asking some citizens of their own community to hear each side and reach a decision.

So please bear with me. I know that this area of the state is growing, and when I first came over here ten years ago as a Federal Judge, I could say this and nobody would bat an eyelash. But more recently when I mention California or New York, there's probably somebody in the audience who have [sic] the experience of living in a major metropolitan area. But I like to say it this way, it is West Virginia. We're not going to mess around. This isn't going to be six month jury selection and a year long trial. We're going to try to get the criminal case selected in about an hour, take a break for those 12 [jurors], continue with the jury selection in the other case, and probably have the criminal case concluded and to you by late afternoon. We're going to try to be very efficient with that.

That having been said, we will start. *[jury selection began]*.

(Dkt.# 83 at 5 - 6).

Petitioner's attempt to bootstrap a matter-of-fact statement by the Court, instructing the jury about its role in a criminal case being to decide guilt, beyond a reasonable doubt, into a defamatory statement about him must fail. The Court was merely saying that the jury's job was to decide *whether* a given defendant was guilty using the "proof beyond a reasonable doubt" standard. The Court was not saying that the defendant was guilty. That counsel did not object to this is not surprising. Counsel cannot be found deficient for failing to object when there was no basis to do so and where objection would be futile. Since petitioner can prove neither deficient performance nor prejudice, he has failed in his burden under Strickland and this claim should be denied.

**Ground Four (g): Whether Trial Counsel was Ineffective Because he Did Not Move to Suppress the Warrantless Search of the Vehicle.**

Here, petitioner argues that counsel's performance was substandard, because he did not move to suppress the warrantless search of the vehicle. Petitioner contends that if the police believed he was selling drugs out of a motel room, "[c]ommon sense dictates . . . that the registration information revealed that a car was also registered to that particular room. As such, the search warrant should have included

the car. While the police asserts [sic] that Petitioner gave them permission to search the vehicle . . .[s]uch permission was obtained without Petitioner being advise [sic] of his Miranda rights. Therefore based on this deficiency [sic] counsel should have moved to suppress the fruits of the vehicle search." (Dkt.# 130-1 at 22).

Custodial interrogations jeopardize the 5th Amendment privilege against self-incrimination. A defendant must be warned, before questioning, of his right to remain silent; advised that: anything he says can be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot not afford an attorney, one will be appointed for him prior to any questioning, if he wishes. Only after these warnings are given can a defendant knowingly and intelligently waive these rights and agree to answer questions or make a statement. Evidence obtained as a result of interrogation is not to be used against a defendant at trial, unless the prosecution can show that the warnings were given and knowingly and intelligently waived. Effective waiver requires that an accused be offered counsel and that he intelligently and understandingly rejected the offer; presuming waiver from a silent record is impermissible. Miranda v. Arizona, 384 U.S. 436; 86 S. Ct. 1602; 16 L. Ed. 2d 694 (1966).

Here, trial testimony of Detective Steve Harris, the arresting officer, was that

A. I am the officer in charge of the Criminal Investigative Division.

Q. Were you engaged in executing a search warrant?

A. I was.

. . .

Q. At Room 67 at the Town House Motel?

A. Yes.

. . .

Q. Who was present in the room?

A. There were three occupants present when the warrant was executed; Hannah Slater, a female, Stephanie Spencer, a female, and the defendant, Dion Drew was present.

. . .

A. Once the warrant was executed, it was my job to assign roles. And Mr. Drew was taken back to the police department, and I followed him back to the department with Deputy Ulrich.

Q. Did you interview him there?

A. I did.

Q. And did you caution him with regard to his rights?

A. I did.

Q. Can you tell us how you did that?

A. Once he was taken back to the police department, I told him basically that we were executing the search warrant, the reason for the search warrant. Also advised him that he didn't have to say anything. That if he wished, he could remain silent. And basically apprised him of the situation. Let him know that he didn't have to say anything if he didn't want to.

Q. Did he talk to you?

A. He did.

Q. What did he tell you during that interview?

A. I mean, it was very unusually cool, unusually calm. And was [sic] adamant that we weren't going to find anything.

Q. Well, did he tell you what you would find?

A. He did specify that he did have cash in the room and he knew [sic] exact amount.

(Dkt.# 83 at 121 - 23).

Q. When you were interviewing Mr. Drew, did you ask him about his automobile?

A. I did.

Q. What did he say in that regard?

A. Again, he was very candid, very forthright, had no problems talking. And we let him know that there was a set of rental keys that were on the table in the room. This was information that was being relayed to me from the search team. Also let him know that the vehicle that was sitting outside was listed as belonging to Number 67. When the room was rented, that vehicle was declared to being [sic] the vehicle that was going to be in the parking lot. This was conveyed to him. And, you know, he was advised that we intended to search it. And again he advised there is nothing in there and gave us verbal consent to search it.

(Id. at 138 - 39).

On cross exam, this exchange was had with defense counsel:

Q. I see. Very well, officer, you indicated on direct that you gave Mr. Drew his Miranda warnings? Told him he had a right to remain silent. Anything he said could be used against him. He had a right to counsel. Isn't that correct?

A. That's not what I said.

Q. Oh, I see, what did you say?

A. What I said was that I told Mr. Drew that he didn't have to say anything, and that, you know, we couldn't make him talk. I was advising him of the situation that was occurring at some point in that he chose to talk. I felt it was voluntary. So to say that his specific Miranda rights were read to him, they were not. I was just engaged in a dialogue with Mr. Drew at that time.

Q. Did you give him his Miranda rights?

A. I did not. After the items had been found in the motel room, the search team relayed back to me that they had found a handgun we were looking for, and they found crack, and it became apparent putting everything together. I went back in with an attempt then to conduct an interrogation of Mr. Drew, and he advised me he did not wish to talk, so nothing further was pursued. Had he wished to conduct the interview at that point in this process, I would have Mirandized him.

(Id. at 141 - 42).

Defense counsel further questioned Detective Harris on the subject:

Q. On direct examination you indicated that when you were asked Mr. Drew a question [sic] - - when you asked Mr. Drew a question?

A. Yes sir.

Q. I believe the terms you used, he was forthright, he was candid with you?

36

A. He was.

Q. What does that mean?

A. His demeanor and attitude and conversation was such that, you know, he wanted to talk. He wanted to tell. In other words, it didn't take prodding. You know, once I started advising, Hey, we're executing a search warrant, this is why, we have got information that you had a gun, that you are selling crack cocaine out of there, he was very quick to say, There's nothing there. You know, There is nothing in my room. And was very quick to offer conversation. I guess that's what I'm trying to say.

Q. I see, but you said that he was candid and forthright. Did that mean he was truthful with you?

A. That's the key word that's missing from that sentence.

Q. He wasn't truthful, but he was candid and forthright?

A. Correct.

Q. You also said he was cool and calm, did you not?

A. Yes, sir. Yes, sir.

(Id. at 144 - 45).

Further, Detective Harris testified on cross exam:

Q. You said that Mr. Drew consented to the search of the vehicle, is that correct?

A. Yes.

A. And based upon that consent, the actual search of the vehicle was performed?

A. Yes, sir.

Q. He didn't tell you at any time that he did not want you to search the room or the vehicle, sir?

A. The - - what part, sir?

Q. He didn't object to you searching the hotel room?

A. We had a warrant. He did not, yes.

Q. I understand. Nor did he object to you searching the vehicle, did he?

37

A.  At no point did he object to any searching.

(Id. at 147 - 48).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized," U.S. v. Williams, 592 F.3d 511, 519 (4th Cir. 2010).  While the Fourth Amendment generally requires police to secure a warrant before conducting a search, California v. Carney, 471 U.S. 386, 390-391, 85 L. Ed. 2d 406, 105 S. Ct. 2066 (1985), the U.S. Supreme Court has long recognized an exception to this requirement for searches of vehicles.  If a vehicle is readily mobile and probable cause exists to believe it contains contraband or evidence of a crime, then a warrantless search is permissible).  See Maryland v. Dyson, 527 U.S. 465, 466,  119 S. Ct. 2013; 144 L. Ed. 2d 442 (1999). See also U.S. v. Ross, 456 U.S. 798, 800, 102 S. Ct. 2157, 72 L. Ed. 2d 57 (1982) (holding that assuming probable cause to search a vehicle, law enforcement may conduct a warrantless search as that is as thorough as a magistrate could authorize in a warrant, even though a warrant has not actually been obtained).

Here, the record reveals that the motel room petitioner was staying in was searched pursuant to a valid warrant.  During the search, items described by the confidential informant were found, including a magazine for a .380 caliber pistol.  The pistol itself was not found in the room.  As such, there was probable cause for a warrantless search the automobile for the additional evidence of the pistol. Additionally, the record also reveals that during the search of the motel room, petitioner identified the vehicle parked outside as one that he had rented and gave verbal permission for it to be searched, specifically denying that anything illegal would be found.  (Dkt.# 1 at 2, Dkt.# 83 at 138 - 39, Id. at 147 - 48). The record reveals that the firearm petitioner was charged with possessing of was located under the back seat of the vehicle, behind the driver's seat.  (Dkt.# 83 at 87).

The record does not support petitioner's claim that his Miranda rights were violated. The evidence is that petitioner spoke voluntarily to the officers after being advised that he had a right to remain silent, before any custodial interrogation was undertaken. He invited them to search the vehicle, denying that they would find anything illegal. Once the gun was found and petitioner was so advised, petitioner exercised his right to remain silent and no custodial interrogation was had. Moreover, even if petitioner had not given his consent to have the vehicle searched, no search warrant was needed for its search. Maryland v. Dyson, *supra* at 466.

Petitioner's contention that counsel was ineffective for not filing a motion to suppress the warrantless search of the vehicle has no support in fact or law. As such, counsel cannot be found ineffective for failing to file a motion to suppress. Counsel is not required to waste the court's time pursuing frivolous legal motions. U.S. v. Bosch, 584 F.2d 1113, 1121 (1st Cir. 1978). Petitioner has neither proven that counsel was ineffective for not filing such a motion, nor has he proven prejudice. Relief should be denied.

### Ground Five (a): Whether Appellate Counsel was Ineffective for Not Raising Petitioner's Ground One Claim on Appeal.

Petitioner contends that appellate counsel's performance was inadequate, because he failed to raise, as grounds for appeal, the violation of petitioner's right to a presumption of innocence that occurred when he was forced appear at trial while dressed in jail clothing.

The standard of effective assistance of appellate counsel is the same as for trial counsel. See Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) ("In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, the applicant must normally demonstrate (1) that his counsel's performance fell below an objective standard of reasonableness in light of the prevailing norms, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (internal citations and quotations

omitted).  On review, however, appellate counsel is accorded the "presumption that he decided which issues were most likely to afford relief on appeal."  Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993).

Moreover, "[c]ounsel is not obligated to assert all nonfrivolous issues on appeal."  Bell v. Jarvis, 236 F.3d at 164.  Instead, "[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review."  Jones v. Barnes, 463 U.S. 745, 752 (1983); see also Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989).  "Indeed, winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the landmark of effective advocacy."  Bell v. Jarvis, 236 F.3d at 164 (quoting Smith v. Murray, 477 U.S. 527, 536 (1986) (internal quotations omitted).  However, although it is "still possible to bring a Strickland claim based on counsel's failure to raise a particular claim" on direct appeal, demonstrating that counsel was incompetent for failing to do so will be difficult.  Smith v. Robbins, 528 U.S. 259, 288 (2000).  "Generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986).

Petitioner's claims that his appellate counsel was ineffective for not raising as a ground for appeal the Ground One violation of petitioner's right to a presumption of innocence that he contends occurred when he was forced appear at trial, dressed in jail clothing, must fail.  This claim has already been addressed *supra,* and proven to be meritless.  Clearly, here, appellate counsel examined the record with a view to selecting the most promising issues for review.  Jones v. Barnes, *supra* at 752.  Since this issue lacked merit, it is not surprising that appellate counsel did not choose it as grounds for appeal.  Generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  Gray v. Greer, *supra* at 646.

Petitioner cannot claim that counsel was ineffective in not raising an issue on appeal when there was no issue to raise. See Smith v. Robbins, 528 U.S. 259, 288 (2000). Moreover, had petitioner chosen to do so, he could have raised this claim on appeal himself, because he filed a *pro se* supplemental brief, along with the other claims he raised. As such, the claim is also procedurally defaulted. Relief should be denied.

**Ground Five (b): Whether Appellate Counsel was Ineffective for Not Raising Petitioner's Ground Two Claim on Appeal.**

Petitioner's contention that appellate counsel was ineffective for not raising as grounds for appeal the Government's violation of its statutory and Constitutional duty to disclose information that could have affected petitioner's decision whether to plead guilty or proceed to trial must also fail. As set forth *supra* in Ground Two, the Government violated no duty to disclose and therefore this claim has no merit. Since this issue lacked merit, it is not surprising that appellate counsel did not choose it as grounds for appeal. Generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Gray v. Greer, *supra* at 646. Petitioner cannot claim that counsel was ineffective in not raising an issue on appeal when there was no issue to raise. See Smith v. Robbins, *supra* at 288. Moreover, petitioner himself could have raised this claim as well, in his *pro se* supplemental appellate brief, but chose not to do so. Accordingly, the underlying claim is procedurally defaulted. Relief should be denied.

**Ground Five (c): Whether Appellate Counsel was Ineffective for Not Raising Petitioner's Ground Three Claim on Appeal.**

Petitioner's contention that appellate counsel was ineffective for not raising as grounds for appeal his Ground Three claim that Indictment was constructively amended when evidence at trial suggested that petitioner possessed a firearm during a "crime of violence," rather than during a drug trafficking crime as charged also fails. Petitioner's Ground Three claim was addressed *supra* and

41

found to lack merit. Since this issue lacked merit, it is not surprising that appellate counsel did not choose it as grounds for appeal. Generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Gray v. Greer, *supra* at 646. Petitioner himself could have raised the Ground Three claim in his own *pro se* supplemental brief, and therefore it is procedurally defaulted. Relief should be denied.

**Ground Five (d):** **Whether Trial Counsel was Ineffective For Failing to Raise, as Grounds for Appeal, Petitioner's Ground Four (b) Claim that Trial Counsel was Ineffective for Failing to Either Stipulate to Petitioner's Prior Felony Drug Conviction or to Request that the Counts Petitioner was Charged with be Severed for Trial Purposes.**

Petitioner's underlying claim, that trial counsel was ineffective for failing to either stipulate to the fact of his prior felony drug conviction or request severance of the charges for trial purposes has already been addressed in Ground Four (b) supra, and found to be lacking in merit. As such, it is not surprising that appellate counsel did not choose it as grounds for appeal. Generally only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Gray v. Greer, *supra* at 646. Moreover, as with petitioner's other IAC claims against appellate counsel, this issue is procedurally defaulted. Petitioner's contention that appellate counsel was also ineffective for not raising this "dead bang" winner of an issue on appeal again omits mention of the fact that he could have raised the issue himself, when he filed his own *pro se* supplemental appellate brief. Relief should be denied.

## IV.   Recommendation

For the reasons stated above, the undersigned recommends that the petitioner's §2255 motion be **DENIED and DISMISSED with prejudice** from the docket.

Therefore, the following should be **DENIED** as moot:

**A**.    Petitioner's request for an evidentiary hearing;

**B**.     Petitioner's request that the Court appoint counsel to represent him at an evidentiary hearing.

Within **fourteen (14) days** after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985): United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address on the docket sheet, and to counsel of record, as applicable.

DATED: January 6, 2011

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE